# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 1, 2024

Lyle W. Cayce
Clerk

No. 22-30758

CONSOLIDATED WITH

No. 23-30021

_____

Kholkar Vishveshwar Ganpat,

*Plaintiff—Appellee*,

*versus*

Eastern Pacific Shipping PTE, Limited, *doing business as* EPS,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-13556

_____

Before Dennis, Engelhardt, and Oldham, *Circuit Judges*.

Kurt D. Engelhardt, *Circuit Judge*:

Defendant-Appellant Eastern Pacific Shipping Pte., Limited ("EPS"), a Singaporean ship management company, appeals the district court's choice-of-law ruling that the claims asserted by Plaintiff-Appellee Kholkar Vishveshwar Ganpat ("Kholkar"), an Indian citizen, are governed by United States law—the Jones Act and general maritime law. Kholkar's claims arise from his having contracted malaria in Africa while working as a

member of the crew of a Liberian ship that EPS manages. We REVERSE and REMAND.

## I.

In May 2017, Kholkar, an Indian citizen, contracted a serious form of malaria while in Africa.[1]  At that time, he worked as a crew member aboard the M/V STARGATE, a Liberian-flagged ship owned by non-party Larchep Shipping, Inc., a Liberian company, but managed by EPS.  EPS, an international ship management company, is incorporated in Singapore and has its principal place of business there.  Kholkar blames EPS for his having contracted malaria, which ultimately caused him to suffer gangrene and amputation of several toes, as well as hospitalization for 76 days. Specifically, Kholkar contends that EPS (1) failed to adequately provision the M/V STARGATE while it was in port in the United States, despite knowing that the ship lacked sufficient antimalarial medication for its upcoming voyage to Gabon, a coastal country in Africa where the risk of contracting malaria is known to generally be high; and (2) failed to dispense appropriate prophylactic antimalarial medication to the ship's crew before, during, and after the vessel's time in Gabon.

Contending that EPS owned and/or operated the M/V STARGATE, and was his "borrowed employer," Kholkar filed this suit against EPS in December 2018.  Alleging negligence, unseaworthiness, and that "EPS has willfully and wantonly failed" to promptly provide/pay maintenance and cure, Kholkar seeks relief under the Jones Act and the general maritime law of the United States.  He also asserts a contractual claim for disability benefits pursuant to Article 24 of the "TCC Collective Agreement" between the

---

[1] Malaria is most often transmitted to humans bitten by a certain type of mosquito that has been infected by a malaria-causing parasite.  Kholkar's malaria was caused by the *Plasmodium falciparum* parasite.

No. 22-30758
c/w No. 23-30021

International Transport Workers' Federation and EPS, which relates to and is made part of Kholkar's "Seafarer's Employment Agreement" with Ventnor Navigation, Inc., a Liberian company.

EPS challenges Kholkar's invocation of United States law, emphasizing that (1) Kholkar is a resident and citizen of the Republic of India; (2) EPS is incorporated under the laws of the Republic of Singapore with its principal place of business in Singapore; (3) Kholkar's claims arise out of his service to, and EPS's management of, a Liberian-flagged vessel owned by a Liberian corporation, Larchep Shipping, Inc.; and (4) Kholkar's employment contract with a Liberian company, Ventnor Navigation, Inc., was signed in India, and contains a provision stating that the "[a]greement shall be governed by and interpreted in accordance with the laws of the state of ships [sic] flag aboard which the [s]eaman is employed," i.e., Liberia.[2]  Furthermore, adds EPS, Kholkar contracted malaria while in Africa, became symptomatic as the ship sailed from Owendo, Gabon (Africa) to Rio de Janeiro, Brazil (South America), and was hospitalized in Brazil before returning to India.  Thus, the only connections between the United States and this lawsuit are (1) Kholkar's choice of forum; (2) EPS's alleged failure to replenish the M/V STARGATE'S antimalarial medications—while the ship was in port in Savannah, Georgia—before it sailed to Barranquilla, Columbia, and then Owendo, Gabon; and (3) EPS-managed ships' frequent travel to/from American ports.

The district court initially deferred making a choice-of-law ruling, reasoning that "development of the facts [was] necessary." Following discovery, however, the parties filed five motions for summary judgment based upon and requiring a choice-of-law determination. The district court

---

[2] *See* Kholkar's "Seafarer Employment Agreement" at ¶ 25. The ship aboard which Kholkar was employed, the M/V STARGATE, is registered in and flies the flag of Liberia.

No. 22-30758
c/w No. 23-30021

concluded that the law of the United States (the Jones Act and general maritime law) governs Kholkar's tort claims and claim for breach of the collective bargaining agreement. *See Ganpat v. Eastern Pacific Shipping Pte., Ltd.*, 642 F. Supp. 3d 524 (E.D. La. 2022).[3] This interlocutory appeal followed.[4]

## II.

In circumstances where multiple nations have a connection to a maritime tort, international maritime law "attempt[s] to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the [nations] whose competing laws are involved." *Lauritzen v. Larsen*, 345 U.S. 571, 582 (1953). "The criteria, in general, appear to be arrived at from weighing [] the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority." *Id.*

### A.

American courts determine whether maritime claims are governed by the law of the United States (the Jones Act and general maritime law), rather than the conflicting law of a foreign nation, utilizing the factors outlined by the Supreme Court's decisions in *Lauritzen v. Larsen*; *Romero v. International Terminal Operating Co.*, 358 U.S. 354 (1959); and *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306 (1970). These factors, which have become to be known as

---

[3] In September 2021, Kholkar amended his complaint to add a claim for "an intentional general maritime law tort" arising from a lawsuit that EPS and its Indian subsidiary, Eastern Pacific Shipping (India) Private, Ltd. ("EPS India"), had filed against him in India. According Kholkar, the Indian suit amounts to "deliberate and malicious efforts to intimidate [him] from seeking legal redress" in the United States. The district court concluded that the law of India governs that claim. 642 F. Supp. 3d at 541–42. That ruling has not been appealed.

[4] The district court certified its choice-of-law rulings for interlocutory appeal, pursuant to 18 U.S.C. § 1292(b), and ordered that the case be stayed pending resolution of the appeal. 642 F. Supp. 3d at 543–44.

No. 22-30758
c/w No. 23-30021

the "*Lauritzen–Rhoditis* factors" are:

> (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured worker; (4) the allegiance of the defendant shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations.

*See Rhoditis*, 398 U.S. at 309; *Solano v. Gulf King 55,* 212 F.3d 902, 905 (5th Cir. 2000). *Lauritzen* identified the first seven factors in 1953. Seventeen years later, the Supreme Court added the eighth factor, in *Rhoditis*, explaining that the list of seven was not intended to be exhaustive, and the totality of the circumstances must be considered. *See Rhoditis*, 398 U.S. at 309 ("[T]he shipowner's base of operations is another factor of importance . . . and there well may be others.").

This test "is not a mechanical one in which the court simply counts the relevant contacts." *Fogleman v. ARAMCO (Araan Am. Oil Co.),* 920 F.2d 278, 282 (5th Cir. 1991). To the contrary, the analysis is guided by the principle that "[t]he purpose of a conflict-of-laws doctrine is to assure that a case will be treated [i]n the same way under the appropriate law regardless of the fortuitous circumstances [that] often determine the forum." *Lauritzen,* 345 U.S. at 590. Thus, "each factor is to be weighed to determine whether all the factors add up to the necessary substantiality of contacts between the transaction at issue and the United States." *Solano*, 212 F.3d at 905 (citing *Rhoditis,* 398 U.S. at 309 n.4).

And certain of the *Lauritzen–Rhoditis* factors "may be substantial in one context" and "of lesser importance in another." *Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1018 (5th Cir. 1981), *overruled on other grounds by In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 821 F.2d 1147 (5th Cir. 1987); *see also Solano*, 212 F.3d at 906; *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, 1119 (5th Cir. 1995). Accordingly, "the significance of each

No. 22-30758
c/w No. 23-30021

factor must be considered within the particular context of the claim and the national interest that might be served by the application of United States law[.]" *Fogleman*, 920 F.2d at 282.

Finally, a proper evaluation of the *Lauritzen–Rhoditis* factors requires an understanding of their background and the evolving maritime contexts in which they are applied. As we explained in *Solano*, "[t]he Supreme Court developed [the *Lauritzen–Rhoditis*] factors in cases involving vessels engaged in commercial or maritime activities that traveled the high seas, passing through territorial waters of more than one nation." 212 F.3d at 906. Because "the virtue and utility of sea-borne commerce lies in its frequent and important contacts with more than one country," *Lauritzen*, 345 U.S. at 581, "the weight accorded the choice of law factors in the context of those cases was dictated by the international nature of the vessels' regular activities, the fortuity of the location of the plaintiffs' alleged accident or injury and the need to establish a uniform, consistent law onboard a ship that traveled through waters of more than one sovereign nation." *Solano*, 212 F.3d at 906–07 (citing *Chiazor*, 648 F.2d at 1019).

Over time, however, the application of the *Lauritzen–Rhoditis* factors has extended to claims arising from nontraditional maritime activities, e.g., offshore drilling operations, in which neither the "seaman nor the vessel was engaged in traditional, blue-water maritime activities crossing through waters of competing nations." *Solano*, 212 F.3d at 907.[5] For this reason, our cases recognize that the significance of the factors may vary when considered in the

---

[5] In this context, "blue water" typically refers to the "open ocean" whereas "brown water" refers to inland waterbodies and coastal waters.

No. 22-30758
c/w No. 23-30021

context of *nontraditional* maritime activities rather than the *traditional* maritime shipping context in which the *Lauritzen–Rhoditis* test arose.[6]

## B.

In this instance, the maritime context in which Kholkar's injury claims arose is unquestionably that of traditional maritime shipping. At the time he contracted malaria, Kholkar served as a member of the crew—an able seaman[7]—of a seafaring vessel, the M/V STARGATE, that regularly transports cargo across international waters between the ports of various sovereign nations situated in diverse locations across multiple continents.[8] And his claims challenge the adequacy of the ship's provisions for these voyages. That is, he asserts that he contracted malaria, while in Gabon, Africa, because his ship lacked an adequate supply of antimalarial medications for sailing in areas where the crew's risk of contracting malaria is high. Finally, Kholkar's claims are asserted against the ship's manager, who allegedly was responsible for ensuring that the ship had adequate provisions.

---

[6] *See, e.g.,* Jack L. Albritton, *Choice of Law in a Maritime Personal Injury Setting: The Domestic Jurisprudence*, 43 LA. L. REV. 879, 895 (1983) (discussing work on mobile offshore drilling rigs, such as jack-up and semi-submersible rigs, and work done on special offshore construction vessels such as derrick barges and pipelaying or offshore tug and supply vessels servicing oil rigs).

[7] Kholkar's expert's report indicates that Kholkar served as a member of the ship's deck department.

[8] In this instance, after Kholkar joined the ship's crew at the end of December 2016, the M/V STARGATE traveled from Casablanca, Morocco, to Las Palmas, Spain, and then to the Ivory Coast of Africa, specifically, Abidjan, and then to Amsterdam, The Netherlands, before arriving in Savannah, Georgia, on April 2, 2017. After leaving Savannah on April 7, 2017, the M/V STARGATE traveled to Barranquilla, Columbia (to load cargo), and then to Gabon, Africa (to discharge cargo). After ten days in Gabon, the ship sailed to Rio de Janeiro, Brazil, where Kholkar was hospitalized, and then to Veracruz, Mexico.

No. 22-30758
c/w No. 23-30021

In the context of traditional maritime shipping activities, the first *Lauritzen-Rhoditis* factor—the place of the wrongful act—generally is of "minimal importance" in cases involving an injured seaman's claims arising from a shipboard tort. *Quintero v. Klaveness Ship Lines,* 914 F.2d 717, 722 (5th Cir. 1990) (citing *Lauritzen*, 345 U.S. at 583). Otherwise, "the shipowner would be subjected to varying law based on the fortuity of the ship's location at the time a shipboard tort occurs." *Id.* at 723. *See also Fogleman,* 920 F.2d at 282 (place of wrongful act is accorded little weight in traditional maritime cases in which the locality of the ship changes constantly). Thus, despite knowing that "ships often spend time in port and that ports are subject to the territorial claim of the sovereign, the [Supreme] Court [has] concluded that maritime law requires a standard that minimizes the significance of location in cases of shipboard torts." *Id.* (citing *Lauritzen*, 345 U.S. at 583–84); *see also Lauritzen*, 345 U.S. at 583 ("The test of location of the wrongful act or omission, however sufficient for torts ashore, is of limited application to shipboard torts, because of the varieties of legal authority over waters she may navigate.").

In contrast, the second factor—the law of the flag—"is generally of cardinal importance" in the context of traditional maritime activities. *Solano,* 212 F.3d at 905–07; *see Lauritzen*, 345 U.S. at 584 ("Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag."). The "law of the flag" refers to the law of the nation in which the ship is registered. As stated in *Lauritzen*, "[e]ach state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it." 345 U.S. at 584. And that "[n]ationality is evidenced to the world by the ship's papers and its flag." *Id.* The heightened importance generally given to the law of the flag has roots in pragmatism, stability, predictability, and

No. 22-30758
c/w No. 23-30021

international comity. *Id.* at 585. Thus, "the flag that a ship flies may, at times, alone be sufficient" to determine which nation's law applies. *Rhoditis*, 398 U.S. at 309 (citing *Lauritzen*, 345 U.S. at 585–86).[9]

But, because shipowners sometimes register their ships in countries other than their own, and nations have an interest in "governing the conduct of [their] own citizens upon the high seas or even in foreign countries," the fourth factor—the allegiance of the defendant shipowner—also is significant.[10] *Lauritzen*, 345 U.S. at 587. Also a result of foreign ship registrations,

---

[9] As articulated in *Lauritzen*:

Some authorities . . . apply the law of the flag on the pragmatic basis that there must be some law on shipboard, that it cannot change at every change of waters, and no experience shows a better rule than that of the state that owns her. It is significant to us here that the weight given to the ensign overbears most other connecting events in determining applicable law. As this Court held in *United States v. Flores*, [289 U.S. 137, 158 (1933) (quoting *Mali v. Keeper of the Common Jail,* 120 U.S. 1, 12 (1887)] . . . :"

And so by comity it came to be generally understood among civilized nations that all matters of discipline, and all things done on board, which affected only the vessel, or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation, or the interests of its commerce should require. * * *

345 U.S. at 585–86 (internal quotation marks omitted).

[10] The *Lauritzen* Court explained the rationale for this factor as follows:

A state is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed. Until recent times this factor was not a frequent occasion of conflict, for the nationality of the ship was that of its owners. But it is common knowledge that in recent years a practice has grown, particularly among American shipowners, to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries. Confronted with such

No. 22-30758
c/w No. 23-30021

the eighth factor—the shipowner's base of operations—"[i]s another factor of importance" in deciding whether United States law applies. *Rhoditis*, 398 U.S. at 309–10.[11] Indeed, in *Rhoditis,* the Court attributed more significance to the Greek shipowner's American base of operations, coupled with the American locale of the plaintiff's injury,[12] than the ship's Greek ownership, registration, and flag. *Id*.[13]

The third factor—the allegiance or domicile of the injured person—also bears consideration insofar as "each nation has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support." *Lauritzen,* 345 U.S. at 585–86. Thus, though "during service [to a ship] under a foreign flag some duty of allegiance is due," an injured

_____

operations, our courts on occasion have pressed beyond the formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which our law places upon them."

*Id*. at 587 (internal quotations and citations omitted).

[11] In the choice-of-law context, the "base of operations" refers to the location from which day-to-day operations are controlled. *Fogleman*, 920 F.2d at 284.

[12] The plaintiff in *Rhoditis* was injured while aboard ship in the Port of New Orleans. 398 U.S. at 307–08.

[13] The Court explained: "We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act 'employer.'" *Id*. at 310. Thus, "the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States." *Id*. The Court emphasized that more than 95% of the corporate shipowner was owned by a United States domiciliary/Greek citizen who managed the corporation in New York and that the ship's entire income was from cargo either originating or terminating in the United States. *Id*. at 307.

seaman's nationality is weighed against that of the ship when the two differ. *Id.* at 586.

When the claim at issue sounds in tort, rather than contract, the fifth factor—the place of contract—generally is not a "substantial influence in the choice between competing laws[.]" *Id.* at 588–89; *see also Romero*, 358 U.S. at 383 ("the place of contracting is largely fortuitous and of little importance in determining the applicable law in an action of marine tort"). And, while acknowledging the sixth factor—the inaccessibility of the foreign forum— *Lauritzen* clarified that it generally "is relevant only to a *forum non conveniens* determination, not to a choice-of-law analysis." *Fogleman*, 920 F.2d at 283 (citing *Lauritzen*, 345 U.S. at 589–90).

Lastly, the seventh factor—the law of the forum—is  given "little weight." *Id.* (citing *Lauritzen,* 345 U.S. at 590–91). Thus, "[t]he fact that the law of another forum may be more or less favorable to a plaintiff . . . does not determine choice of law." *Id*. at 284; *see also Salono*, 212 F.3d at 907 (that application of United States law would provide the plaintiffs a more generous recovery is not a valid consideration in the choice-of-law analysis).

## C.

Considered in the context of this case, involving traditional maritime shipping activities and assertions of wrongdoing yielding a seaman's "shipboard injury," none of the Lauritzen-Rhoditis factors that the Supreme Court has deemed significant to the choice-of-law determination in traditional maritime shipping cases involve the United States. Specifically, the law of the flag factor, which generally is "of cardinal importance" in the traditional maritime shipping context, points to Liberia. Of course, the law of the flag does not always prevail, particularly when, as the Court explained in *Lauritzen* and *Rhoditis*, a ship's country of registration differs from its country of ownership and/or the shipowner's base of operations. Here, however,

No. 22-30758
c/w No. 23-30021

unlike in *Lauritzen* and *Rhoditis*, the shipowner is not a defendant to this action. Rather, all of Kholkar's claims are asserted against EPS, the ship's manager, which Kholkar alleges acted as the ship's operator, *de facto* owner, and his "borrowed employer." But, if EPS is substituted in place of the "shipowner" referenced in factors four and eight, its allegiance and base of operations point to Singapore.

The interests of the Republic of India are added to the mix by the third and fifth factors—the allegiance or domicile of the injured person and the place of the contract. On the other hand, Kholkar's employment contract (which is incorporated into the "TCC Collective Agreement" that is the basis of Kholkar's disability benefits claim against EPS) includes a clause providing that the "[a]greement shall be governed by and interpreted in accordance with the laws of the state of ships [sic] flag aboard which the [s]eaman is employed," which, again, is Liberia.[14]

Thus, the only *Lauritzen-Rhoditis* factor that favors an application of the law of the United States is the seventh factor—the law of the forum. As previously noted, however, that factor typically is given "little weight" in the choice-of-law determination. *Fogleman*, 920 F.2d at 283.

## III.

Upon its consideration of the eight *Lauritzen-Rhoditis* factors, the district court determined that it was left with "only two factors to resolve the choice of law issue in this case: [the] allegiance of the [d]efendant (Singapore) and [the] law of the forum (United States)." 642 F. Supp. 3d at 536–37 & n.87. In reaching this conclusion, the district court construed the first factor, the place of the wrongful act, to refer to the geographical location of the plaintiff's injury, rather than the geographical location of the alleged

---

[14] *See* "Seafarer Employment Agreement" at ¶ 25.

wrongful conduct. *Id.* at 531, 538. Thus, because Kholkar did not suffer symptoms of malaria until he was "on the high seas" of the Atlantic Ocean, i.e., not in the territorial waters of any of the countries involved here, the district court decided that, in this instance, the place of the wrongful act factor has no particular application. *Id.* at 532, 537.

Though noting its usual importance in traditional maritime cases, the district court decided that the second factor, the law of the flag, is inapplicable here because the vessel's Liberian owner is not a party to the suit. *Id.* at 531–33, 537. The eighth factor, the base of the shipowner's operations, was deemed inapplicable for the same reason. With the fourth factor, the allegiance of the defendant shipowner, the district court again disregarded the vessel's Liberian ownership, because of its nonparty status, but decided EPS's allegiance to Singapore weighs in favor of applying Singaporean law. *Id.* at 533–34, 537 & n.84.

The district court recognized that the third factor, the allegiance or domicile of the injured worker, points towards application of Indian law, but gave it little weight. *Id.* at 533, 537 & n.84. The court reasoned that "this factor is given little significance in traditional, blue-water maritime shipping cases like this one where a seaman's work, given its transient nature, frequently takes him beyond the territorial boundaries of his place of domicile or allegiance." *Id.* at 533.

The district court also concluded the fifth factor, the place of the contract, does not apply in the context of Kholkar's tort claim, while emphasizing that Kholkar's contract claim is against EPS, not his nonparty employer. *Id.* at 534–37. Finally, the district court concluded that the sixth factor, the inaccessibility of the foreign forum, has no choice-of-law relevance, but the seventh factor, the law of the forum, favors application of United States law. *Id.* at 535–38.

No. 22-30758
c/w No. 23-30021

Despite acknowledging that the only *Lauritzen-Rhoditis* factor favoring the application of American law—the law of the forum—"is often not given substantial weight in the choice of law analysis," the district court concluded that it, "buttressed by [two] additional significant contacts[,] . . . supports the application of United States law to [Kholkar's] maritime tort claims." *Id.* at 537 n.87, 538–40. First, the district court emphasized the American location of one of the allegedly negligent *acts*, as opposed to the place of *injury*, specifically, EPS's failure to replenish the ship's supply of antimalarial drugs while it was in port in Savannah, Georgia. *Id.* at 538–39. The district court reasoned that "the United States has a substantial interest in regulating shipboard behavior in its ports and ensuring that ships leaving its ports are properly provisioned," which "is a substantial connection that tips the scale in favor of applying United States law." *Id.* at 539. Second, because "EPS-managed vessels, including the M/V STARGATE, made hundreds of visits to U.S. ports during the time period surrounding [Kholkar's] injury," the district court reasoned that the EPS "is not a 'casual visitor' to the United States." *Id.* at 539–40. "This connection," the court concluded, also "points toward the application of United States law." *Id.* at 539.

For a number of reasons, we disagree with the district court's assessment. As initial matter, the district court erred to the extent that it concluded that the "law of the flag" and the "base of operations" factors necessarily lack choice-of-law significance in cases where the shipowner is not a defendant. The application of those factors and their significance must instead be evaluated and decided in the context of the particular case before the court. And, in traditional maritime shipping cases brought by an injured crew member against a defendant who is alleged to have acted as the owner of the vessel

No. 22-30758
c/w No. 23-30021

*and* to have breached duties generally owed by the shipowner,[15] the law of the flag factor maintains at least some significance.[16]

Next, the district court attributed predominate significance to the United States locale—Savannah, Georgia—of one of the allegedly negligent *acts* resulting in the *injury* that Kholkar later suffered when he contracted malaria in Africa and then became ill while sailing the "high seas" of the Atlantic Ocean. In doing so, the district court erred. Although we agree that, in 1953, when *Lauritzen* was decided, the first factor—the place of the "wrongful act"—contemplated the place of the plaintiff's *injury*,[17] it is clear that the Court's focus, in assigning it minimal choice-of-law significance, was the *fortuity* of location, not the *speed* at which negligent conduct resulted in injury. *See Lauritzen*, 345 U.S. at 583 ("The test of location of the wrongful act or omission . . . is of limited application to shipboard torts [] because of the varieties of legal authority over waters she may navigate."); *Quintero*, 914 F.2d

_____

[15] The full scope of services provided by EPS, pursuant to its contract with the vessel owner, Larchep, is not clear on the record before us.

[16] Our decision in *Coats* is not to the contrary. To start, the claims at issue there arose in the context of nontraditional maritime activities, not traditional maritime shipping. Additionally, the non-shipowner defendant (to whom the law of the flag had "no specific application") provided "repair and maintenance services to oilfield and marine vessels" incidental to drilling operations; it did not act in the place of the vessel owner (as to whom the court *did* consider the ship's flag). And *both* defendants' allegiances and bases of operations were considered. *Coats*, 61 F.3d at 1119–21.

[17] *See, e.g.,* Restatement (First) of Conflicts §§ 377–380 (1934). Indeed, this court has consistently found the place of injury, not the place of other alleged negligence is the place of the wrongful act. *McClelland Engineers, Inc. v. Munusamy*, 784 F.2d 1313, 1319 (5th Cir. 1986), *overruled by In re Air Crash Disaster Near New Orleans, La. on July 9, 1982,* 821 F.2d 1147 (5th Cir. 1987). In *Lauritzen*, "the place of the wrongful act" referred to the geographic location where the "acts giving rise to the liability" occurred. 345 U.S. at 573, 582–83. There, "the tortious conduct occurred and caused injury in Cuban waters," specifically, the Havana harbor. *Id.* at 573, 582.

15

at 723 ("maritime law requires a standard that minimizes the significance of location in cases of shipboard torts"; otherwise, "the shipowner would be subjected to varying law based on the fortuity of the ship's location at the time a shipboard tort occurs"); *see also Solano*, 212 F.3d at 906 ("the weight accorded the choice of law factors . . . was dictated by the international nature of the vessels' regular activities, the fortuity of the location of the plaintiffs' alleged accident or injury and the need to establish a uniform, consistent law onboard a ship that traveled through waters of more than one sovereign nation").   Thus, we disagree that the *minimal* choice-of-law significance that *Lauritzen* otherwise assigned to a seafaring ship's location at a given point in its travels would *substantially* increase simply because all of the acts leading to that injury did not occur in the same place as the injury.

    In explaining the substantial choice-of-law significance that it gave to the location of some of the allegedly negligent conduct, the district court found support in decisions from other circuits. *Id.* at 538 & nn.92–93 (citing *Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co.,* 426 F.3d 580, 587 (2d Cir. 2005) and *Cooper v. Meridian Yachts, Inc*., 575 F.3d 1151, 1175 (11th Cir. 2009)).   Neither of those cases, however, involved a "bluewater" crew member's claim against a vessel owner, operator, or manager based on a shipboard tort.   Thus, both cases  are materially distinguishable from this one.[18]   The same is true of this circuit's decisions involving *nontraditional* maritime activities in which the location of negligent conduct *has* had significant choice-of-law significance. *See, e.g., Coats*, 61 F.3d at 1119–20 (citing *Chiazor*, 648 F.2d at 1019) ("[t]he place of the wrongful act, the allegiance or domicile of the injured, and the place of the contract, which are less important in the shipping context, are more significant in nontraditional

---

[18]  Additionally, we are not bound by other circuits' opinion.

cases"); *Solano*, 212 F.3d at 904–07 (discounting the law of the flag and the allegiance of the defendants, which favored United States law, and giving more weight to Nicaraguan law, because facts of the case were more analogous to operations on a fixed drilling platform than traditional maritime commerce); *Fogleman*, 920 F.2d at 282 (unlike in traditional maritime cases in which the ship's locality changes constantly, the "place of the wrong assumes greater importance" when the injury arises from work on a permanently situated offshore oil rig or work platform); *McClelland Eng'rs., Inc. v. Munusamy*, 784 F.2d 1313, 1317 (5th Cir. 1986) (("In cases in which the 'vessel' is *not* a 'true maritime vessel [—one plying the seas as an integral part of the shipping industry—]' but rather an 'unconventional' vessel, such as a platform or rig, . . . the place of the wrongful act . . . take[s] on 'added significance.'"") (quoting *Chiazor*, 648 F.2d at 1018–19)); *Bailey v. Dolphin Int'l, Inc.*, 697 F.2d 1268, 1276 (5th Cir. 1983) (fortuitous circumstances warranting less significance being given to the place of the wrongful act are not present in offshore drilling context where operations are conducted in a more permanent fashion).

The district court's choice-of-law analysis also emphasizes that EPS is not a "casual visitor" to the United States." *Id.* at 539–40.  Absent an American "base of operations" or other relevant, significant ties to the United States, however, that "EPS-managed vessels, including the M/V STARGATE, made hundreds of visits to U.S. ports during the time period surrounding Plaintiff's injury" likewise carries little choice-of-law significance in the context of a maritime case involving traditional maritime activities. *See Rhoditis*, 398 U.S. at 309–10; *see also Quintero,* 914 F.2d at 723 (that a ship operating worldwide called at United States ports did not, without

No. 22-30758
c/w No. 23-30021

more, support a finding of a United States base of operations).[19] As explained in *Lauritzen,* it is because "the virtue and utility of sea-borne commerce lies in its frequent and important contacts with more than one country" that "frequent and regular . . . commerce and contacts with the ports of the United States" do *not* justify "applying our statutes to incidents aboard the [defendant's] ships." 345 U.S. at 581. And, if the courts of each of these countries "were to exploit every such contact to the limit of its power, it is not difficult to see that a multiplicity of conflicting and overlapping burdens would blight international carriage by sea." *Id.*

Lastly, *Lauritzen* also shows that the application of United States law cannot be justified here simply because "ensuring that ships leaving its ports are properly provisioned" is prudent, wise, or in the interest of the "greater good." *Id.* at 593. In fact, the *Lauritzen* Court rejected an argument that it should apply the Jones Act "as a means of benefiting seaman" and enhancing the competitive advantage of American ship operators," explaining:

> Nor do we stop to inquire which law does whom the greater or the lesser good. The argument is misaddressed. It would be within the proprieties if addressed to Congress.

*Id.* Similarly, though policy reasons might here provide a valid basis for responsive legislation, international trade agreements, or agency regulations, they are not determinative of the choice-of-law question before this court.

As previously noted, "[t]he purpose of a conflict-of-laws doctrine is to assure that a case will be treated [i]n the same way under the appropriate law regardless of the *fortuitous* circumstances which often determine the forum." *Id.* at 591 (emphasis added); *see also Kriti Filoxenia Special Mar. Enter.*

---

[19] The record is unclear regarding the total number of ships that EPS managed in 2017. One document references 88 vessels with 34 of those reaching U.S. ports. Another lists 56 vessels.

*v. YASA H. MEHMET Motor Vessel*, 442 F. App'x 167, 169 (5th Cir. 2011)
(unpub.).  Applying United States law here would achieve the opposite re-
sult, i.e., the substantive law governing the plaintiff's claims would be deter-
mined *solely* by the fortuitous circumstance of the ship's transient location at
a particular point in its travels.  Thus, although the United States has the in-
terests identified by the district court, we must disagree that they "tip the
scale" in this case in favor of applying United States law.

IV.

Given our determination that Kholkar's claims are not governed by
United States law, the next logical question is which country's law does ap-
ply.  The district court did not decide this particular question.  Rather, the
focus of the district court's inquiry was whether the United States' connec-
tions with this action and its underlying facts were such that United States
law, as opposed to the law of a foreign country or countries (Liberia, Singa-
pore, and/or India), should govern Kholkar's claims arising therefrom.  How-
ever, the district court did narrow its focus to the United States and Singa-
pore. On appeal, Kholkar's brief does not address the issue; rather, its argu-
ments simply urge the correctness of the district court's determination that
United States law applies.  EPS challenges the district court's choice-of-law
analysis and requests that we direct the district court to apply Liberian law to
Kholkar's tort and contract claims on remand.

Because Kholkar's employment contract contains a choice-of-law
provision selecting the law of Liberia, and the terms of that agreement are
incorporated into the contract upon which his claim for disability benefits is
based, we are convinced that Kholkar's breach of contract claim is likewise
governed by the law of Liberia.  With respect to Kholkar's other claims, the
law of the flag factor, which points to Liberia, generally is "of cardinal im-
portance" in cases involving traditional maritime shipping activities.  As we
note above, however, the law of the flag country does not always prevail. This

No. 22-30758
c/w No. 23-30021

is especially true where circumstances convince the court that the vessel's place of registration has been selected for the purpose of allowing the vessel owner to avoid more stringent regulation than would otherwise apply. But, in this instance, the only defendant, EPS, is *not* the vessel's registered owner. On the other hand, Kholkar alleges that EPS is the vessel's operator and "de facto" owner, as well as his "borrowed employer," and has breached duties typically owed by the vessel owner and the Jones Act employer.

Were it necessary for us to determine whether the alleged circumstances of this case are such that the law of the flag's usual preeminence should be disregarded in order to decide whether Kholkar's claims are governed by Liberian law, as EPS argues, rather than the law of Singapore or India, we likely would leave these matters for the district court to decide upon remand. Here, we do not, however, because Kholkar has not asserted, much less shown, that the relevant portions of the law of Singapore and/or India conflict (in his favor) with the law of Liberia. Thus, in this instance, we are satisfied the law of the flag prevails. Accordingly, with the exception of the intentional tort claim concerning EPS's India lawsuit,[20] Kholkar's maritime tort and contract claims are to be adjudicated under the substantive law of Liberia.

## V.

For the reasons stated herein, we REVERSE the district court's choice-of-law determination and REMAND for further proceedings consistent with this opinion.

---

[20] Because Kholkar did not appeal the district court's choice-of-law determination regarding that claim, the law governing it is not at issue in this appeal. *See* note 5, *supra*.